# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TRUSTCO BANK, a federal savings bank, and ORE PROPERTY TWO, INC., a Corporation,<br><br>          Plaintiffs,<br><br>          v.<br><br>SUSAN M. MATHEWS, RBC TRUST COMPANY (DELAWARE) LIMITED, a Delaware Corporation, solely in its capacity as trustee, THE SUSAN M. MATHEWS DELAWARE TRUST I, a Delaware Trust, THE SUSAN M. MATHEWS DELAWARE TRUST II, a Delaware trust, THE SUSAN M. MATHEWS DELAWARE TRUST III, a Delaware trust, COLIN R. MATHEWS, BRENDAN R. MATHEWS, DEVIN R. MATHEWS, KIERNAN R. MATHEWS, and DOES I through X,<br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No.  8374-VCP |

## MEMORANDUM OPINION

Submitted: September 19, 2014
Decided: January 22, 2015

William J. Burnett, Esq., FLASTER/GREENBERG, P.C., Wilmington, Delaware; Harry J. Giacometti, Esq., Alexis Arena, Esq., FLASTER/GREENBERG, P.C., Philadelphia, Pennsylvania; *Attorneys for Plaintiffs.*

Robert A. Penza, Esq., Christopher M. Coggins, Esq., POLSINELLI PC, Wilmington, Delaware; *Attorneys for Defendants Susan M. Mathews, Colin R. Mathews, Brendan R. Mathews, Devin R. Mathews, and Kiernan R. Mathews.*

William M. Kelleher, Esq., GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Attorneys for the Trust Defendants.*

**PARSONS, Vice Chancellor.**

This action involves allegedly fraudulent transfers. The parties dispute which state's law and, more importantly, which state's statute of limitations applies. The plaintiffs assert that New York's six-year or two-years-from-discovery statute of limitations governs the plaintiffs' claims. The defendants argue that either Delaware or Florida law controls and that most of the plaintiffs' claims are barred by the identical four-year or one-year-from-notice statutes of limitations adopted by both of those states. Before the Court is the defendants' motion for partial summary judgment on the statute of limitations issue. For the reasons that follow, I conclude that New York's statute of limitations does not apply to this case and grant the defendants' motion for partial summary judgment. Even if New York law did apply, however, the defendants still would be entitled to summary judgment. The plaintiffs' primary fraudulent transfer claims, therefore, are time barred.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff TrustCo Bank ("TrustCo") is a federal savings bank with a principal place of business in Glenville, New York. TrustCo provided a construction loan to StoreSmart of North Ft. Pierce, LLC ("StoreSmart"), a Florida limited liability company.

---

[1] The uncontested facts recited herein are drawn from the pleadings. All other facts are derived from the documentary record submitted by the parties. I confine the facts only to what is necessary to understand and resolve this motion for partial summary judgment.

1

Plaintiff ORE Property Two, Inc. ("ORE," and together with TrustCo, "Plaintiffs") is a Florida corporation[2] and the assignee of TrustCo's rights, title, and interest in the StoreSmart loan and related agreements.

Defendant Susan M. Mathews ("Ms. Mathews") has homes in both Cambridge, Massachusetts and Fort Pierce, Florida, with Florida as her primary residence. Before 2009, Ms. Mathews was a resident of New York.[3] Ms. Mathews was a manager and member of StoreSmart and personally guaranteed the loan from TrustCo to StoreSmart.

Defendants Colin R. Mathews, Brendan R. Mathews, Devin R. Mathews, and Kiernan R. Mathews (collectively the "Mathews Children," and together with Ms. Mathews, the "Mathews Defendants") are the purported beneficiaries of several trusts established by Ms. Mathews.

Defendants The Susan M. Mathews Delaware Trust I ("Trust I"), The Susan M. Mathews Delaware Trust II ("Trust II"), and The Susan M. Mathews Delaware Trust III ("Trust III," and collectively, the "Three Trusts") are Delaware trusts established on December 21, 2006. Ms. Mathews is the grantor of each of the Three Trusts. Defendant RBC Trust Company (Delaware) Limited ("RBC," and together with the Three Trusts, the "Trust Defendants") is a Delaware corporation with its principal place of business in

---

[2] The First Amended Verified Complaint (the "Complaint") states only that ORE's principal place of business is in Florida. Records on the Florida Department of State website confirm that ORE is a Florida corporation. I take judicial notice of this fact pursuant to D.R.E. 201(b)(2).

[3] Mathews Defs.' Opp. Br. to Pls.' Renewed Mot. for a Prelim. Inj. ("Mathews Defs.' PI Opp."), Ex. E ("Mathews Dep.") 8-9.

Wilmington, Delaware. RBC is the trustee of each of the Three Trusts and is named as a defendant solely in that capacity.

Doe Defendants I through X (the "Doe Defendants") are unidentified persons who allegedly received transfers of property from Ms. Mathews or an entity in which she held an interest. The Doe Defendants, the Mathews Defendants, and the Trust Defendants collectively comprise the "Defendants" in this action.

### B.    Pertinent Facts

TrustCo lent $9,300,000 to StoreSmart in July 2006 for the purpose of constructing a self-storage facility in St. Lucie, Florida (the "StoreSmart Loan"). The StoreSmart Loan was secured by StoreSmart's real estate and other assets. Ms. Mathews also executed a personal guaranty of the StoreSmart Loan. That loan was modified twice, first in June 2008 and again in March 2009. StoreSmart defaulted in April 2011. On April 25, 2011, TrustCo filed a foreclosure action against StoreSmart and Ms. Mathews in Florida state court. That case resulted in a judgment on July 12, 2011, in favor of TrustCo of roughly $8.2 million plus post-judgment interest (the "Foreclosure Judgment"). TrustCo assigned its rights, title, and interest in the StoreSmart Loan, including the related security agreements, and the Foreclosure Judgment to ORE in August 2012. Plaintiffs, StoreSmart, and Ms. Mathews agreed to entry of a deficiency judgment of about $2.3 million and submitted a stipulation to that effect to the Florida court in February 2013, which the court approved (the "Deficiency Judgment").

Plaintiffs allege that various transfers to the Three Trusts constituted fraudulent transfers. The parties dispute whether the initial transfers that funded the Three Trusts

3

were fraudulent at all. Plaintiffs, as evidenced by this lawsuit, assert that the transfers were effected to place Ms. Mathews's assets out of their reach. Defendants contend that Ms. Mathews created the Three Trusts as part of her estate planning, which was underway before she guaranteed the StoreSmart Loan. For purposes of the pending motion for summary judgment, however, I need not resolve this dispute. This Memorandum Opinion focuses on Defendants' statute of limitations defense and, in that regard, I assume, without deciding, that the challenged transfers were fraudulent.

Plaintiffs' Complaint challenges several transfers. The most important of these seem to be the transfers of ITRAX stock. Ms. Mathews co-founded a company called Corporate Health Dimensions ("CHD"). CHD grew substantially and by 2000 had about 700 employees.[4] Ms. Mathews retired from CHD in 1999, but remained on the board of directors. She retained her CHD stock, which apparently was a significant, if not the primary, source of her wealth. CHD was purchased by a company called ITRAX in 2004. Walgreens later purchased ITRAX in 2008.[5] In two sets of transfers that took place on January 9 and 22, 2007, Ms. Mathews transferred her ITRAX stock to Trust II and Trust III (generally, the "ITRAX Transfers").[6]

Ms. Mathews also held an interest in Terra Optima Ventures, LLC ("TOV"). TOV was an investment vehicle for a business owned by Colin R. Mathews. Ms.

---

[4] *Id.* at 31-33.

[5] *Id.* at 38.

[6] Mathews Defs.' PI Opp., Exs. 8-9.

4

Mathews sold her interest in TOV to one of the Three Trusts in or about March 2010 for $63,000 (generally, the "TOV Transfer").[7] Because the TOV interest had been valued at one-half million dollars only about a year earlier, Plaintiffs contend that the TOV sale was a fraudulent transfer.[8] Defendants contend that they have produced all relevant information and that the ITRAX Transfers and the TOV Transfer constitute the entire universe of relevant transfers.

The parties devoted the lion's share of their briefing to the ITRAX Transfers. They vigorously dispute when Plaintiffs had notice of those transfers. Accordingly, I focus on that issue as well. Plaintiffs maintain that they did not have legally sufficient notice of the ITRAX transfers—such that the statute of limitations would begin to run— until July 19, 2011.[9] Defendants contend that Plaintiffs had notice at numerous times before that date. In particular, Defendants contend that the July 19, 2011 date is a litigation-contrived fabrication because Plaintiffs responded to Defendants'

---

[7]     Mathews Dep. 140-43.

[8]     Plaintiffs assert that additional discovery likely will reveal other fraudulent transfers. At this point, however, the specifically identified transfers are the ITRAX Transfers and the TOV Transfer. Defendants do not contend that Plaintiffs' challenge to the TOV Transfer is untimely.

[9]     Pls.' Supplemental Br. in Supp. of Mot. for Prelim. Inj. ("Pls.' Suppl. PI Br.") 20 ("Until approximately July 19, 2011, TrustCo did not have sufficient documented facts from which it could have reasonably concluded that that [sic] the Transfers of ITRAX stock to the Delaware Trusts were actually or constructively fraudulent.").

5

interrogatories by listing June 2010 as the earliest date that they learned that Ms. Mathews "had transferred funds to 'Delaware Trusts.'"[10]

Defendants also note several significantly earlier dates when Plaintiffs allegedly received information about the ITRAX Transfers that should have put them on notice. In connection with the discussions leading up to the first modification of the StoreSmart Loan, Ms. Mathews submitted a net worth statement to TrustCo on March 25, 2008, that reported her net worth at $11,773,446. On April 11, 2008, Ms. Mathews supplied a revised net worth statement to TrustCo indicating her net worth to be $5,578,857. That revised statement included the annotation: "I am the discretionary beneficiary of each of the 3 Delaware trusts that have been established as part of estate planning."[11] As part of the loan modification process, Ms. Mathews wrote in a May 6, 2008 email to Paul Steenburgh, a TrustCo Assistant Vice President and one of TrustCo's Rule 30(b)(6) deponents, that TrustCo had requested that she either "guarantee the loan with all 3 Delaware Trusts or put up another $1MM in collateral."[12] At his deposition, Steenburgh recalled receiving this email and stated that Ms. Mathews's description of Trustco's position was correct.[13] The final terms of the first modification did include an additional $1,000,000 in collateral, as well as several other conditions, such as opening a $250,000

[10] Trust Defs.' Resp. to Pls.' Mot. for Prelim. Inj. ("Trust Defs.' PI Resp."), Ex. C ("Pls.' Interrog. Resps.") No. 25.

[11] Mathews Defs.' PI Opp., Ex. 10 (net worth statements).

[12] *Id.*, Ex. 13.

[13] *Id.*, Ex. B ("Steenburgh Dep.") 28-32.

6

escrow account with TrustCo.[14] The first modification to the StoreSmart loan closed on June 27, 2008. The accompanying closing binder included a copy of Trust II's Trust Agreement.[15]

Finally, a series of conversations between Ms. Mathews and Michelle Simmonds, a TrustCo Vice President, occurred in May, June, and July 2010. Simmonds testified at her deposition that those conversations concerned transfers to Delaware trusts now known to be the ITRAX Transfers, which Simmonds understood rendered Ms. Mathews insolvent.[16] This testimony comports with Plaintiffs' interrogatory response that they were aware of the transfers to the Three Trusts in June 2010. In sum, Defendants contend that Plaintiffs had: (1) inquiry notice in March and April of 2008; (2) inquiry notice on May 6, 2008; (3) inquiry notice on June 27, 2008; and (4) both inquiry notice and actual notice of the alleged fraudulent ITRAX Transfers in May 2010.

## C.    Procedural History

Plaintiffs filed their initial complaint on March 1, 2013, along with a motion to expedite and a motion for a preliminary injunction. That complaint specifically alleged violations of Delaware's fraudulent transfer statute.[17] On May 28, 2013, Plaintiffs

---

[14]    *Id.*, Ex. 17.

[15]    *Id.*, Ex. 16, Item 15.

[16]    Mathews Defs.' PI Opp., Ex. C ("Simmonds Dep.") 15-16.

[17]    6 *Del. C.* §§ 1304-05.

amended their complaint to remove all references to substantive Delaware law. That pleading is the operative Complaint. Defendants answered on June 7, 2013.

In an effort to halt all distributions from the Three Trusts, Plaintiffs renewed their motion for a preliminary injunction ("PI") on July 2, 2013. Briefing on that motion proceeded in a staccato fashion, with the parties making relatively short initial submissions followed by supplemental briefing.[18] I heard argument on the PI motion on September 27, 2013 (the "Argument"). The parties later stipulated to a limited PI, which required that any TOV shares in the possession of the Three Trusts not be disposed of, and I issued an oral ruling on December 31, 2013, denying the other aspects of Plaintiffs' PI motion (the "December Ruling").

During briefing on the PI, it became clear that the statute of limitations issue likely would be outcome determinative as to significant portions of Plaintiffs' claims in this case. Not surprisingly, therefore, the parties devoted a large portion of the PI briefing to that issue.[19] The parties frame the dispute as whether Plaintiffs' claims are subject to the statute of limitations under Delaware law or New York law. After the Argument and at the Court's suggestion, Defendants requested that the Court treat their submissions on the

---

[18]    The briefing consisted of: (1) Plaintiffs' Opening Br. in Supp. of Their Renewed Mot. for a PI ("Pls.' Opening PI Br."); (2) Trust Defs.' PI Resp.; (3) Pls.' Suppl. PI Br.; (4) Trust Defs.' Resp. to Pls.' Supplemental Br. in Supp. of Their Mot. for Prelim. Inj. ("Trust Defs.' Suppl. PI Resp."); (5) Mathews Defs.' PI Opp.; and (6) Pls.' Reply in Supp. of Their Renewed Mot. for a Prelim. Inj. ("Pls.' PI Reply").

[19]    Indeed, anticipating this problem, Plaintiffs included on the second page of their opening brief in support of a PI a half-page footnote explaining why their claims were not time barred.

8

PI as the equivalent of a motion for partial summary judgment on the statute of limitations issue. Plaintiffs changed counsel immediately before the December Ruling and, in early 2014, the parties agreed to proceed on Defendants' motion as to the statute of limitations question. Following further limited discovery, the parties filed another round of supplemental briefing on that motion.[20]

On July 28, 2014, Plaintiffs moved to file still further supplemental briefing or, in the alternative, a supplemental pleading under Court of Chancery Rule 15(d). Defendants opposed this belated request, and I denied it on September 19.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

"Summary judgment is granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[21] When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party.[22] Summary judgment will be denied when the legal question

---

[20] The now-summary judgment briefing consisted of: (7) Pls.' Opp. to Defs.' Mot. for Summ. J. ("Pls.' SJ Br."); (8) Trust Defs.' Supplemental Memo. in Supp. of Summ. J. ("Trust Defs.' SJ Br."); and (9) Mathews Defs.' Answering Supplemental Memo. in Supp. of Summ. J. ("Mathews Defs.' SJ Br.").

[21] *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[22] *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977).

9

presented needs to be assessed in the "more highly textured factual setting of a trial."[23]

The Court also "maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application."[24]

### B. Laches versus Statute of Limitations

The parties focused their briefing on the proper statute of limitations, which is not necessarily conclusive. The Court of Chancery is a court of equity and follows the doctrine of laches. Laches is the equitable analog of the statute of limitations defense. Laches will prevent someone who slumbers on her rights and delays unreasonably in filing suit from being permitted to prosecute her claims. "To prevail on a laches defense, a defendant must prove that: (1) the plaintiff had knowledge of his claim; (2) he delayed unreasonably in bringing that claim; and (3) the defendant suffered resulting prejudice."[25]

Generally, this Court will look to the analogous statute of limitations to determine whether a plaintiff's delay was unreasonable. As the Delaware Supreme Court has stated, "Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims

---

[23]  *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n.3 (Del. Ch. 1987) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948)).

[24]  *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006) (quoting *Cooke v. Oolie,* 2000 WL 710199, at *11 (Del. Ch. May 24, 2000)).

[25]  *Petroplast Petrofisa Plasticos S.A. v. Ameron Int'l Corp.*, 2009 WL 3465984, at *14 (Del. Ch. Oct. 28, 2009).

are barred by laches."[26]  Indeed, a "filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches."[27]  In this case, Plaintiffs presented no persuasive justification as to why the relevant statute of limitations period should not guide the laches analysis.  As such, and because I am unable to articulate any independent reason for concluding otherwise,[28] I find that the applicable statute of limitations here should be determinative as to whether Plaintiffs delayed unreasonably in filing suit more than six years after the allegedly fraudulent transfers took place.

Even if another state's substantive law may govern the parties' rights in a given case, the "general rule is that the forum state's statute of limitations applies."[29]  This is consistent with the general principle that the procedural law of the forum state (here, Delaware) usually applies.  One exception to this rule arises when "the procedural law of the foreign state is 'so inseparably interwoven with substantive rights as to render a modification of the foregoing rule necessary, lest a party be thereby deprived of his legal

---

[26]  *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009).

[27]  *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[28]  *See IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 178 (Del. 2011) (listing factors indicative of "unusual conditions or extraordinary circumstances" when laches should not follow the statute of limitations, none of which are present here).

[29]  *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *4 (Del. Super. Apr. 16, 2014); *see also MPEG LA, L.L.C. v. Dell Global B.V.*, 2013 WL 812489, at *3 (Del. Ch. Mar. 6, 2013).

rights.'"[30] Thus, for example, in a case involving a dispute over a Missouri insurance policy, the Delaware Superior Court concluded that Missouri's law regarding the allocation of the burden of proof—a procedural issue—in insurance coverage and exclusion disputes was so intertwined with the parties' substantive rights as to trigger the exception.[31] This exception is inapplicable in this case, however. The statute of limitations for fraudulent transfers in New York is merely New York's general statute of limitations for fraud. Nor is there any evidence that New York's statute of limitations for fraud claims has any special connection to that state's fraudulent transfer law, or that the two are so "inseparably interwoven" as to warrant an exception to the general rule of applying the forum state's procedural law.[32] Nevertheless, in this case, the general rule of following the forum state's relevant statute of limitations arguably may be modified by either Delaware's borrowing statute or Delaware's Qualified Dispositions in Trust Act, both of which are discussed *infra*.

### III.    ANALYSIS

Defendants seek partial summary judgment that Plaintiffs' claims for fraudulent transfer as to the ITRAX Transfers are barred by the relevant statute of limitations and

---

[30]    *MPEG LA*, 2013 WL 812489, at \*3 (quoting *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1994 WL 317557, at \*4 (Del. Super. Apr. 15, 1994)).

[31]    *Monsanto Co.*, 1994 WL 317557, at \*4 ("This Court has determined Missouri's allocation of the burden of proof regarding coverage provisions and exclusions are designed primarily to affect the outcome of trial and are intertwined with the parties' substantive rights.").

[32]    *Id.* (quoting *Connell v. Del. Aircraft Indus.*, 55 A.2d 637, 640 (Del. Super. 1947)).

laches. Those transfers occurred in January 2007. An additional disputed transfer, the TOV Transfer, occurred in March 2010.[33] As such, regardless of which statute of limitations applies, the TOV Transfer does not appear to be barred by laches and I do not understand it to be subject to Defendants' motion for partial summary judgment. Plaintiffs initially filed suit in March 2013. Plaintiffs also admit that they discovered the potentially fraudulent ITRAX Transfers by July 19, 2011.[34] Accordingly, this Memorandum Opinion first uses the July 19, 2011 date as the undisputed, key date by which Plaintiffs had discovered the fraudulent transfers under the various statutes of limitations.

Plaintiffs argue that New York's statute of limitations applies to their fraudulent transfer claims. Under New York law, an action to avoid a fraudulent transfer must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."[35] Defendants contend that Delaware's statute of limitations governs. Under Delaware law, an action to avoid a fraudulent transfer must be brought "within 4 years after the transfer was made or the

---

[33] It is not clear to what extent Plaintiffs also challenge additional transactions, other than the TOV Transfer, as being fraudulent. Any additional transfers that Plaintiffs may challenge presumably occurred more recently and, therefore, would not be subject to a laches defense.

[34] Pls.' Supp. PI Br. 8.

[35] N.Y. C.P.L.R. § 213(8).

13

obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant."[36]

Plaintiffs filed their initial complaint more than six years after the January 2007 ITRAX Transfers occurred. Even under New York law, therefore, Plaintiffs must rely on having filed within two years of discovery of the allegedly fraudulent transfer. Assuming the undisputed July 19, 2011 discovery date—which, considering Plaintiffs' earlier interrogatory responses stating a June 2010 date, is generous[37]—Plaintiffs' filing of their claims to avoid the ITRAX Transfers in March 2013 would be sufficiently timely to survive summary judgment if New York law governed.[38] If Delaware's (or Florida's) statute of limitations applies, Plaintiffs' fraudulent transfer claims as to the ITRAX Transfers are substantially outside the relevant limitations period, which would have run by July 19, 2012, at the latest.[39]

---

[36]     6 *Del. C.* § 1309.

[37]     *See infra* Section III.D.

[38]     Defendants, however, still would be able to prove that those claims are time barred if they could show that Plaintiffs could with reasonable diligence have discovered the fraud before March 2011. For the reasons discussed in Section III.D, *infra*, I find that the unrebutted evidence adduced by Defendants in connection with their pending motion provides a separate and independent reason for granting that motion. That is, the record shows that Plaintiffs were on at least inquiry notice of their claim that the ITRAX Transfers were fraudulent in or before July 2010.

[39]     F.S.A. § 726.110; 6 *Del. C.* § 1309.

## A. The Delaware Borrowing Statute

The Delaware Legislature has altered the usual rule of applying the forum state's statute of limitations through 10 *Del. C.* § 8121 (the "Borrowing Statute"). That statute provides that:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.[40]

Plaintiffs argue that their causes of action arose in New York. Because Plaintiffs sued in Delaware, which has a shorter statute of limitations than New York, the clear and unambiguous language of the Borrowing Statute would seem to require application of Delaware's statute of limitations. The analysis, however, is not so simple.

The Delaware Supreme Court has held that there are certain situations in which the Borrowing Statute does not apply, notwithstanding the fact that the statute's literal language would seem to make it applicable. In *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co.*,[41] Saudi Basic, a Saudi Arabian participant in a joint venture, sued its venture partners in the Superior Court seeking a declaratory judgment that certain royalty payments were not overage charges under any contract between it and the other

---

[40]    10 *Del. C.* § 8121.

[41]    866 A.2d 1 (Del. 2005).

15

joint venturers. The joint venturers counterclaimed, sought damages, overcame a statute of limitations defense, and initially prevailed following a jury trial. On appeal, Saudi Basic argued that the Delaware Borrowing Statute required application of Delaware's relevant three-year statute of limitations; under Saudi law, by contrast, the joint venturers' claims were "eternal" and thus subject to no limitations period whatsoever. The Supreme Court stated that applying the statute so literally to require use of Delaware's three-year time limit would "subvert the statute's fundamental purpose by enabling [Saudi Basic] to prevail on a limitations defense that would never have been available to it had the overage charge claims been brought in the jurisdiction where the cause of action arose, *i.e.*, Saudi Arabia."[42] The Supreme Court, therefore, declined to apply the Borrowing Statute in the circumstances before it. Plaintiffs urge a similar result here.

The *Saudi Basic* decision appears to have engendered some uncertainty as to when the Borrowing Statute applies, with some cases taking the view that the statute simply does not apply if there is no evidence of forum shopping.[43] Generally speaking, courts interpret statutes to give effect to the intent of the Legislature, but are not free to

---

[42] *Id.* at 18-19 (footnote omitted).

[43] *See Furnari*, 2014 WL 1678419, at *5 ("The Court is not satisfied that the Borrowing Statute applies here . . . . Importantly, Florida has longer limitations periods than Delaware, making the facts of this case the opposite of what the Borrowing Statute seeks to prevent; Plaintiff . . . only seeks jurisdiction over the parties.").

16

disregard the unambiguous language of a statute.[44] The Delaware courts, however, have recognized that exceptions can be crafted even to clear and unambiguous statutes when absurdity otherwise would result.[45] The Supreme Court did not mention the absurdity principle in *Saudi Basic*. The language of that decision, however, suggests that the Court concluded that literal application of the Borrowing Statute to the facts before it would render an absurd and unjust result.[46] Indeed, a literal application of the Borrowing Statute in *Saudi Basic* would have led to the absurd outcome that a litigant, by forum shopping and filing in Delaware, could brandish as a sword to defeat claims that would not be time barred where the claims arose a statute designed as a shield to prevent parties from having to defend against claims that otherwise would be time barred.

Against this backdrop, the *Saudi Basic* case has been read as delivering a fairly narrow holding that the Borrowing Statute does not apply when a litigant engages in the very practice the statute sought to prevent—*i.e.*, forum shopping—and would benefit

---

[44] *See Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999) ("The goal of statutory construction is to determine and give effect to legislative intent. If a statute is unambiguous, there is no need for judicial interpretation, and the plain meaning of the statutory language controls.") (footnote omitted).

[45] *Reddy v. PMA Ins. Co.*, 20 A.3d 1281, 1287-89 (Del. 2011) (describing the history of the "absurd result" principle and its acceptance and application in Delaware).

[46] The Court employed language indicating that application of the Borrowing Statute would "undercut the overriding purpose of borrowing statutes," *Saudi Basic*, 866 A.2d at 17, and "subvert the statute's fundamental purpose," *id.* at 18. Those phrases comport with the trial court's language, which was quoted in the Supreme Court's opinion, that applying the Borrowing Statute as Saudi Basic argued would "'basically turn the borrowing statute on its head for the purpose for which it was enacted.'" *Id.* at 15.

unjustly from the Borrowing Statute's application.[47] This reading recognizes that courts have a duty to apply statutes faithfully and that the literal language of a statute will be set aside only in extraordinary circumstances.[48] Presumptively, therefore, the Borrowing Statute does apply when a plaintiff's cause of action arose out of state, irrespective of whether the plaintiff is forum shopping.[49] Thus, only on a set of facts similar to *Saudi*

---

[47] *Huffington v. T.C. Gp., LLC*, 2012 WL 1415930, at *9 (Del. Super. Apr. 18, 2012) ("*Saudi Basic* did not create a broad rule banning the use of the borrowing statute in all situations except for the 'typical' scenario. Rather, it demonstrates the Delaware Supreme Court's unwillingness to allow the borrowing statute to be abused by a party shopping for a forum to avoid an adversary's counterclaims.") (footnote omitted).

[48] In this regard, I note that the Supreme Court in *Saudi Basic* provided as an independent justification for its holding that, even if the Borrowing Statute did apply to the facts before it, Delaware's statute of limitations would have been tolled and the joint venturers' counterclaims still would not have been time barred. *Saudi Basic*, 866 A.2d at 18-19.

[49] The United States District Court for the District of Delaware recently reached a similar conclusion in a case with facts analogous to this dispute:

> Unlike in *Saudi Basic*, application of the borrowing statute here does not unfairly prejudice a party other than the party that chose to file suit in Delaware. While the situation here may not present the circumstances with which Delaware was most concerned when it adopted its borrowing statute—as the Court is not confronted with a party that has brought its case to Delaware for the purpose of benefiting from Delaware's longer statute of limitations—it remains the fact that the literal language of Delaware's borrowing statute makes it applicable to the circumstances presented here.

*TL of Fla. v. Terex Corp.*, 2014 WL 3362367, at *4 (D. Del. July 3, 2014). *See also Cent. Mortg. Co. v. Morgan Stanley Capital Hldgs. LLC*, 2012 WL 3201139, at *16 (Del. Ch. Aug. 7, 2012) (applying Borrowing Statute and using Delaware's statute of limitations over New York's longer statute of limitations in a case with no forum shopping without citation to *Saudi Basic*); *In re Winstar Commc'ns*, 435 B.R. 33, 44-46 (Bankr. D. Del. 2010) (same).

18

*Basic*, where an absurd outcome or a result that subverts the Borrowing Statute's fundamental purpose otherwise would occur, will a party be able to avoid the Borrowing Statute's unambiguous language.[50] In my opinion, any greater alteration to the statute, such as limiting its application solely to situations where there is evidence of forum shopping, is the province of the Legislature.[51]

---

[50] Such a situation occurred in *In re Washington Mutual, Inc.*, 2010 WL 3238903 (Bankr. D. Del. Aug. 13, 2010). There, the Bankruptcy Judge concluded that the Borrowing Statute did not apply in a bankruptcy proceeding because applying the statute would allow a debtor to forum-shop to seek the shortest possible statute of limitations for claims against it, just as Saudi Basic filed in Delaware in an apparent effort to defeat its joint venturers' counterclaims. "To allow [a debtor] to use the benefit of Delaware's shorter limitations period would subvert the anti-forum-shopping purpose of the borrowing statute." *Id.* at *5. In both *Washington Mutual* and *Saudi Basic*, the party that would be the "natural defendant" in a lawsuit, *i.e.*, the delinquent debtor and the party allegedly in breach of a contract, respectively, sought to avail themselves of the Borrowing Statute in order to avoid having to answer for otherwise valid claims against them. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Turner Constr. Co.*, 2014 WL 703808, at *3 (Del. Super. Feb. 17, 2014) (discussing the natural alignment of parties in litigation and stating that "Delaware courts take a 'rather dim view of declaratory judgment claims of non-breach made for purposes of forum shopping'") (quoting *E-Birchtree, LLC v. Enter. Prods. Operating L.P.*, 2007 WL 914644, at *3 (Del. Super. Jan. 18, 2007)).

[51] Citing a line of cases from the Superior Court and the United States Bankruptcy Court for District of Delaware (the "Delaware Bankruptcy Court") that have interpreted *Saudi Basic*, some of which are in conflict, the Court of Chancery recently concluded that "the Borrowing Statute only applies when a party seeks to take advantage of a longer Delaware statute of limitations to bring a claim that would be time-barred under the law of the jurisdiction governing the claim." *Bear Stearns Mortg. Funding Trust 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *8 (Del. Ch. Jan. 12, 2015). The Court in *Bear Stearns* noted that, "Although the court believes that the holding in *Central Mortgage* better reflects the plain language of the Borrowing Statute, this court is bound to follow the Delaware Supreme Court's opinion in *Saudi Basic*." *Id.* at *9.

19

Finally, having concluded that the Borrowing Statute presumptively applies here, despite the absence of evidence of forum shopping, I note that Plaintiffs rely heavily on *Juran v. Bron*[52] as supporting a contrary conclusion. There, the Court determined that the existence of innumerable contacts to California showed that the dispute truly was a "California case" and presented "one of those 'unusual' or 'special' circumstances where the Court, as a Court of Equity, should not look to the applicable statute of limitations at law for guidance."[53] Similarly, Plaintiffs here argue that this case involves an exclusively New York dispute and that it would be inequitable, therefore, rigidly to apply the statute of limitations including the Borrowing Statute. As the next Section demonstrates, however, the contacts to New York are significantly less important than Plaintiffs assert and certainly not as compelling as the situation in *Juran*.

---

As the foregoing discussion indicates, however, the *Saudi Basic* decision involved an unusual set of facts and there are compelling rationales, such as affording appropriate deference to the language employed by the Legislature, for not expanding that decision beyond its arguably limited holding. Moreover, there is no uniform line of decisions that has revealed a consistent interpretation of the Supreme Court's holding. In fact, the relevant case law on the issue is in conflict, with three groups of decisions: (1) those cases interpreting *Saudi Basic* broadly, such as *Furnari* (Del. Super.) and *Bear Stearns* (Del. Ch.); (2) those cases interpreting *Saudi Basic* narrowly, such as *TL of Florida* (D. Del.) and *Huffington* (Del. Super.); and (3) those cases that have applied the Borrowing Statute without citing *Saudi Basic*, such as *Central Mortgage* (Del. Ch.) and *In re Winstar* (Bankr. D. Del.).

[52] 2000 WL 1521478 (Del. Ch. Oct. 6, 2000).

[53] *Id.* at *11.

20

## B. The Most Significant Relationship Test

For Delaware's Borrowing Statute to have any applicability, the causes of action must have arisen outside of Delaware.[54] To determine where the causes of action arose in this case, I look to Delaware's conflict of law rules. "Delaware conflict of law rules direct that the Court determine where a plaintiff's claims arose by application of the 'most significant relationship' test, as set forth in the *Restatement (Second) Conflict of Laws* ("Restatement")."[55] The parties dispute which state has the most significant relationship to Plaintiffs' claims. Defendants argue that Delaware or, alternatively, Florida has the greatest connection. Plaintiffs maintain that New York has the most significant relationship. But Defendants counter that, even if the cause of action arose in New York, the Delaware Borrowing Statute still renders Plaintiffs' claims untimely. As noted previously, however, Plaintiffs contend that the connection to New York is so strong here that application of the Borrowing Statute would be inequitable, for the reasons stated in *Juran*.

The Restatement factors differ slightly depending on whether the alleged wrong sounds in tort or contract. For torts, the relevant factors are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties,

---

[54] 10 *Del. C.* § 8121 ("Where a cause of action arises outside of this State . . . .").

[55] *TL of Fla.*, 2014 WL 3362367, at *5 (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991)).

21

and (d) the place where the relationship, if any, between the parties is centered."[56] For contract claims, the relevant factors are: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."[57] In both the tort and the contract contexts, the Restatement directs that these factors "are to be evaluated according to their relative importance with respect to the particular issue."[58]

Fraudulent transfers bear some resemblance to both tort and contract claims and do not fit neatly into either category. Fraud claims, for example, sound in tort.[59] A fraudulent transfer, however, does not necessarily require misrepresentation or scienter. Indeed, such a transfer can occur even without proof of fraudulent intent if, for example, the debtor did not receive reasonably equivalent value in the exchange and the transfer results in the debtor having unreasonably small assets in relation to its business.[60] Transactions of this kind can reduce the likelihood that the debtor will be able to satisfy its contractual obligations, such as, for example, paying off a loan obtained from a

---

[56]    *Restatement (Second) Conflict of Laws* § 145 (1971).

[57]    *Id.* § 188.

[58]    *Id.* §§ 145, 188.

[59]    *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 325-27 (Del. Ch. 2013) (discussing elements of a fraud claim as a tort with numerous citations to the *Restatement of Torts*).

[60]    6 *Del. C.* § 1304.

22

creditor. From this perspective, a fraudulent transfer may appear more like a contract claim and some courts have so concluded.[61] Based on this uncertainty as to how best to classify a fraudulent transfer claim, I address both the Restatement's tort and contract factors in turn.

I note at the outset that, fundamentally, this case is an action to recover on a deficiency judgment resulting from an unfulfilled personal guaranty by Ms. Mathews to pay the StoreSmart Loan. Plaintiffs' efforts to avoid the ITRAX Transfers to one or more of the Three Trusts are merely a means to that end. With that in mind, I start with the place of injury. A corporation sustains its injuries where it is incorporated and where it has its principal place of business, with the latter location generally being considered more important.[62] Plaintiff TrustCo is a New York bank with operations in New York, Florida, Massachusetts, and Vermont. According to the Complaint, Plaintiff ORE's principal place of business is Florida. Plaintiffs assert that the place of injury is New York, because the breach of the personal guaranty injured TrustCo in New York, where it is headquartered. The amount owed on the personal guaranty, however, is the amount of the Deficiency Judgment, a Florida judgment. TrustCo assigned its rights in the Deficiency Judgment to ORE, a Florida corporation with its principal place of business in

---

61    *See In re Astropower Liquid. Trust*, 2006 WL 2850110, at *5 (Bankr. D. Del. Oct. 2, 2006) (citing federal cases).

62    *See UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *4 (Del. Ch. Dec. 19, 2005); *Eureka Res., LLC v. Range Resources-Appalachia, LLC*, 62 A.3d 1233, 1238 (Del. Super. 2012).

Florida. It is unclear from the Complaint whether TrustCo also assigned Ms. Mathews's personal guaranty to ORE. In any event, because the Complaint seeks the exact amount of the Deficiency Judgment (plus interest and costs of collection), ORE appears to be the plaintiff with the most significant interest here. ORE suffered its injury in Florida, the site of its principal place of business. Although the Complaint alleges that ORE "is a corporation related to TrustCo," the two plaintiffs are separate legal entities with principal places of business in different states. On those facts, I consider the place of the injury factor to be neutral as between New York and Florida.

The conduct causing the injury occurred mostly in Florida and Delaware. Plaintiffs emphasize that the StoreSmart Loan was entered into in New York, that payment was due to TrustCo in New York, and that the Three Trusts were created and funded by Ms. Mathews while she lived in New York.[63] I find, however, that these facts are outweighed by the additional facts that: (1) the StoreSmart Loan was for construction of a business in Florida, which did occur; (2) the event giving rise to this entire dispute was the failure of the StoreSmart business; (3) TrustCo foreclosed on that property in a Florida court; (4) TrustCo assigned its interest in the StoreSmart Loan, including the subsequent Deficiency Judgment from a Florida court, to a Florida corporation; (5) the ITRAX Transfers were made to Delaware trusts governed by Delaware law; and (6) the trustee of the Three Trusts is a Delaware entity. In terms of the relative importance of these considerations, the failure of the Florida business endeavor and the transfers to the

---

[63]     Pls.' PI Reply 6-7.

Delaware trusts were the pivotal events leading to the dispute in this case. Thus, the conduct causing the injury factor favors Florida somewhat and Delaware somewhat, but only minimally implicates New York.

The parties to this dispute reside in or are incorporated in numerous states. Plaintiffs are a New York bank and a Florida corporation. Defendants include three Delaware trusts and a Delaware corporation, as well as several individuals. Of the individual defendants, Ms. Mathews was a New York resident when the first actions giving rise to this dispute occurred, but now resides in Florida. Her children, the beneficiaries of the Three Trusts, reside mostly in Massachusetts, with one child in Illinois. Plaintiffs assert that the "two main actors," TrustCo and Ms. Mathews, resided in New York; thus, they contend that this factor favors New York.[64] The primary purpose of Plaintiffs' claims, however, is to claw back the proceeds of the ITRAX stock from the Three Trusts or their beneficiaries. But, neither the trusts nor their beneficiaries are located in New York. This factor does not obviously favor any state but, based on the location of and law governing the Three Trusts, may weigh slightly in favor of Delaware.

The parties' relationship probably is centered in Florida, but it also may be in Delaware. Although New York loan documents may have caused the money to move from TrustCo to StoreSmart, this case fundamentally is about the StoreSmart Loan, Ms. Mathews's guaranty of it, and ORE's attempt to enforce the Deficiency Judgment by reaching funds held by the Three Trusts and their beneficiaries. StoreSmart was a Florida

---

[64]     *Id.* at 8.

entity operating its business in Florida, the Deficiency Judgment is a Florida Judgment, and ORE is a Florida corporation. Hence, a case can be made for Florida. Focusing on the state of the parties at the time this action was filed, the relationship also may be centered in Delaware, where the Three Trusts are located. It is money held by those trusts that Plaintiffs seek to recover. Overall, I conclude that the tort factors from the Restatement moderately favor Florida. Delaware has the next strongest connection to this case, with New York having the weakest relationship to it.

Many of the contract factors have been discussed already. In terms of the place of contracting, negotiation, and performance, those factors favor New York, but only slightly. Moreover, because TrustCo assigned its interests to a Florida corporation and this action centers on enforcement of a Deficiency Judgment from Florida, the importance of those factors and New York's connection to the StoreSmart Loan is lessened here. The subject matter of the contract shifts the focus back to Florida and, as with the tort analysis, the residence and place of business of the parties is neutral. The contract factors therefore are either in equipoise between New York and Florida or only weakly favor New York.

For the foregoing reasons, I find that Florida has the most significant relationship to this case. Delaware is close behind. Because both states have identical statutes of limitations, the choice of Florida over Delaware has minimal importance, if any, to the outcome of Defendants' motion for partial summary judgment. Notably, even if I did conclude that New York has the most significant relationship, the preceding analysis shows that that relationship certainly does not dominate the focus of this action. That is,

26

the totality of the relevant factors does not reveal a strong New York-centric relationship between the parties and the dispute before this Court. Accordingly, even if I found that New York law should apply, there is nothing in this set of facts that would lead me to conclude that application of the Delaware Borrowing Statute would be inequitable. "The matter before this Court does not exhibit any of the 'special circumstances' present in *Juran*, because the underlying facts are not tied solely to New York."[65]

In sum, Florida likely has the most significant relationship to this case and its four-year statute of limitations should apply. Alternatively, Delaware has the next most significant relationship and has essentially an identical statute of limitations. Under either of those scenarios, the Borrowing Statute is not applicable.[66] As a third alternative, even if New York did have the most significant relationship, its contacts are not sufficient to make this case a "special circumstance" where application of the Borrowing Statute to preclude use of New York's longer statute of limitations would be inequitable. As such, if New York did have the most significant relationship, then the Borrowing Statute would be triggered and Delaware's statute of limitations nevertheless would apply. Regardless of which of these three states has the most significant relationship with this case, therefore, I conclude that Plaintiffs still would be subject to a statute of limitations

---

[65]   *In re Winstar Commc'ns*, 435 B.R. at 45.

[66]   *See In re W.R. Grace & Co.*, 418 B.R. 511, 518 (D. Del. 2009) (noting that where both of the possible states have the same statute of limitations, the Borrowing Statute does not resolve the question of the applicable limitations period and the most significant relationship test is applied).

equivalent to Delaware's of four years from the time the transfer was made or one year from when discovery of the transfer occurred or reasonably should have occurred, whichever is longer. Because Plaintiffs did not file this action relating to the ITRAX Transfers until after the expiration of that time period, I hold that their claims regarding the ITRAX Transfers are barred by laches.

### C.     The Qualified Dispositions in Trust Act

Defendants argue that Delaware's statute of limitations applies for the independent reason that the Qualified Dispositions in Trust Act (the "QDTA") controls this dispute.[67] The QDTA limits a creditor's available remedies when attempting to avoid a "qualified disposition." A "qualified disposition" is a "disposition by or from a transferor . . . to 1 or more trustees, at least 1 of which is a qualified trustee, with or without consideration, by means of a trust instrument."[68] Defendants contend that this case involves such qualified dispositions. In that regard, they aver that: Ms. Mathews was a "transferor" in that she owned property and disposed of that property;[69] RBC satisfies the definition of a qualified trustee;[70] and the Three Trusts each are governed by a "trust instrument."[71] The QDTA requires that any claim by a creditor—a term defined to include Plaintiffs—to

---

[67]     12 *Del. C.* §§ 3570-3576.

[68]     *Id.* § 3570(7).

[69]     *Id.* § 3570(10).

[70]     *Id.* § 3570(8).

[71]     *Id.* § 3570(11).

28

avoid a qualified disposition must be brought pursuant to 6 *Del. C.* §§ 1304 or 1305, Delaware's fraudulent transfer statutes.[72]  The QDTA also specifically provides that a creditor's claim will be extinguished unless, as relevant here, it is brought within the time constraints of 6 *Del. C.* § 1309, Delaware's statute of limitations for fraudulent transfers.[73]  Finally, the QDTA states that: "The Court of Chancery shall have exclusive jurisdiction over any action brought with respect to a qualified disposition."[74]

Defendants argue that the QDTA is a statutory command requiring both that Plaintiffs file their suit here in Delaware, specifically in the Court of Chancery, and that this Court apply Delaware's statute of limitations in Section 1309 without regard to any most significant relationship analysis.  Plaintiffs contend, primarily, that the QDTA is substantive law and that, under the most significant relationship test, this Court must apply New York law.  In the previous Section, I rejected the proposition that New York has the most significant relationship with this case.  Therefore, I do not consider Plaintiffs' primary contention persuasive.  Plaintiffs further argue that the restrictions of the QDTA are inapplicable to this case because Ms. Mathews maintains impermissible control over the property transferred to the Three Trusts.[75]

---

[72]     In their initial complaint, Plaintiffs explicitly asserted claims under Sections 1304 and 1305.

[73]     12 *Del. C.* § 3572(b)(2).

[74]     *Id.* § 3572(a).

[75]     *See id.* § 3571 (providing that, subject to certain exceptions in 12 *Del. C.* §§ 3570(8) and 3570(11)(b), "a transferor shall have no rights or authority with

In Section III.C *supra*, I concluded that Plaintiffs' claims relating to the ITRAX Transfers are barred because of either the most significant relationship choice of law analysis, which points to the use of Florida or, perhaps, Delaware law, or Delaware's Borrowing Statute, which requires the application of Delaware's statute of limitations even if New York had been found to have the most significant relationship to this case. As a result, I find it unnecessary to resolve the question of whether in this case the QDTA requires application of Delaware's fraudulent transfer statute of limitations without regard to the normal choice of law analysis or the Borrowing Statute.

I do note the following, however. First, little case law interpreting the QDTA exists and some of the issues implicated here appear to be ones of first impression. Second, after conclusion of the briefing on the motion for partial summary judgment currently before me, the Court of Chancery rejected the argument that the QDTA requires suits to avoid a qualified disposition to be brought exclusively in Delaware.[76] Third, whether Ms. Mathews maintains impermissible control over the assets transferred to the

---

respect to the property that is the subject of a qualified disposition or the income therefrom, and any agreement or understanding purporting to grant or permit the retention of any greater rights or authority shall be void").

[76] *In re Daniel Kloiber Dynasty Trust*, 2014 WL 3924309, at *10-13 (Del. Ch. Aug. 6, 2014) (concluding that 12 *Del. C.* § 3572(a) confers exclusive jurisdiction on the Court of Chancery as against other Delaware courts, not to the exclusion of other states' courts, and stating that, "Delaware has not sought through the Qualified Dispositions Act to arrogate exclusive jurisdiction for itself, nor could it").

Three Trusts such that the QDTA's restrictions would not apply presents a material question of disputed fact not appropriate for summary resolution on the current record.

For all of these reasons, and because the previous Section of this Memorandum Opinion provides a sufficient basis for resolving the pending motion, I decline to reach the question of whether the QDTA requires application of 6 *Del. C.* § 1309. Moreover, based on the existence of disputed facts as to Ms. Mathews's control of the Three Trusts, that question cannot be decided on summary judgment.

### D.  Analysis Under New York's Statute of Limitations

Summary judgment also is appropriate for the independent reason that Plaintiffs' claims are untimely even if New York's statute of limitations applies. Under New York law, an action to avoid a fraudulent transfer must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."[77] "The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred.'"[78]

---

[77]  N.Y. C.P.L.R. § 213(8). This discussion assumes that Plaintiffs are alleging actual fraud. Constructive fraud claims have a six-year statute of limitations. N.Y. C.P.L.R. § 213(1); *Wall Street Assocs. v. Brodsky*, 684 N.Y.S.2d 244, 258 (A.D. 1999). The concept of inquiry notice only applies to actual fraudulent conveyances. *Jaliman v. D.H. Blair & Co.*, 964 N.Y.S.2d 112, 114 (A.D. 2013).

[78]  *Sargiss v. Magarelli*, 909 N.E.2d 573, 576 (N.Y. 2009) (quoting *Erbe v. Lincoln Rochester Trust Co.*, 144 N.E.2d 78, 80 (N.Y. 1957)).

31

Furthermore, New York law imposes a duty of inquiry. "'[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth . . . knowledge of the fraud will be imputed to him.'"[79]

The preceding portions of this Memorandum Opinion assumed a July 19, 2011 discovery date, because the present motion seeks summary judgment and Plaintiffs concede that they had at least inquiry notice of the alleged fraud by that date. On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party, in this case, Plaintiffs. "However, once the moving party has satisfied its initial burden of 'demonstrating the absence of a material factual dispute,' the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[80] Defendants presented evidence of four dates earlier than July 19, 2011, on which Plaintiffs arguably had notice. The Simmonds deposition testimony as to discussions about the ITRAX Transfers in May, June, and July of 2010 provides particularly strong evidence that Plaintiffs were on at least inquiry notice by mid-2010. In fact, that testimony is consistent with Plaintiffs' own interrogatory responses, which referred to a June 2010 discovery date.

---

[79] *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (A.D. 2011) (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)) (internal quotations omitted).

[80] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (quoting *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del. Ch. 2007)) (footnote omitted).

Plaintiffs have offered no explanation as to why they should not be bound by their own admission and the consistent testimony of their Rule 30(b)(6) witnesses. Mere *ipse dixit* in their briefing that they did not have adequate notice until July 19, 2011, is insufficient to create a genuine dispute of material fact.[81] In their supplemental brief in support of a preliminary injunction, for instance, Plaintiffs make the conclusory assertion that none of the information provided around the time of the first modification to the StoreSmart loan in 2008 sufficed to put them on notice.[82] Even if true—a questionable assumption[83]—Plaintiffs made no mention of Simmonds's deposition testimony, or the testimony of Robert Leonard, a Senior Vice President of TrustCo, both of which occurred nearly a month before the filing of that brief, nor did Plaintiffs make any attempt to explain their own interrogatory responses.

In their reply brief in support of a preliminary injunction, Plaintiffs argued that Defendants misstated the record regarding Simmonds's testimony and that her deposition

---

[81] *Cf. Shimko v. Honeywell Int'l Inc.*, 2014 WL 4942189, at *5-6 (Del. Super. Sept. 30, 2014) (discussing the "sham affidavit" doctrine, which precludes the submission of affidavits contradicting prior sworn deposition testimony, without explanation, in an effort to defeat summary judgment by creating a dispute of fact where none exists).

[82] Pls.' Suppl. PI Br. 20-22.

[83] Although Plaintiffs dismiss the statement relating to Ms. Mathews being a beneficiary of Delaware trusts as only a "vague footnote," the relevant documents instead reveal a series of one-page net worth statements. A comparison of the March 25, 2008 statement and the April 11, 2008 document shows a net worth reduction of six million dollars with a conspicuous statement referring to Delaware trusts appearing immediately beneath the total net worth amount on the April 11 document.

does not support the conclusion that TrustCo had notice of the ITRAX Transfers. Having reviewed that testimony, and drawing all reasonable inferences in Plaintiffs' favor, I find that, while Simmonds may not have known exactly what specific assets were transferred, she knew that some transfers had taken place. Although unaware of the exact time of the transfers, Simmonds understood the time frame to have coincided with one of the two loan modifications, which occurred in 2008 and 2009, respectively.[84] She further testified as to having three discussions with Ms. Mathews, a meeting in May 2010 and phone conversations in June and July 2010.[85] Simmonds specifically was asked whether "from Ms. Mathews' statements to you that you understood that at the time Ms. Mathews . . . made the transfers, whenever she made them, that those transfers rendered her insolvent? Do you contend that's what Ms. Mathews told you?"[86] Simmonds replied affirmatively.[87]

Simmonds's testimony shows that, by July 2010, a TrustCo official was aware that Ms. Mathews had transferred assets to Delaware trusts and believed that those transfers had rendered Ms. Mathews insolvent. Simmonds's testimony supports the inference— particularly in light of the other evidence TrustCo received at the time of the first modification of the StoreSmart Loan, which is discussed in Section I.B *supra*—that

---

[84]    Simmonds Dep. 9.

[85]    *Id.* at 15.

[86]    *Id.* at 15-16.

[87]    *Id.* at 16.

TrustCo was on at least inquiry notice by July 2010 and with reasonable diligence should have discovered the allegedly fraudulent transfers Ms. Mathews made.

This conclusion is bolstered by the deposition testimony of Leonard, another Rule 30(b)(6) deponent for TrustCo. According to Leonard, at a May 2010 meeting, Ms. Mathews informed him that she "took moneys and put them in a trust to hide them from creditors."[88] Leonard understood that Ms. Mathews's stated intent was to protect those assets from her boyfriend's creditors, but he also testified that "I felt at the time that she was protecting them from us, TrustCo Bank."[89] Indeed, in a letter to Ms. Mathews dated June 21, 2010, Leonard wrote "You have indicated the majority of these [equity] funds were transferred to Delaware Trusts" and requested that she provide to TrustCo all documents relating to the trust accounts.[90]

Thus, between May and July 2010, two TrustCo officers discussed with Ms. Mathews the fact that she had made significant transfers of her assets to Delaware trusts. Plaintiffs also indicated in a sworn interrogatory response that they had notice of transfers to Delaware trusts as early as June 2010. In response to Defendants' request for partial summary judgment, Plaintiffs have failed to present any evidence that would contradict the sworn deposition testimony of their own deponents, nor any persuasive rationale for disregarding their interrogatory responses. Accordingly, I conclude that Plaintiffs were

---

[88] Mathews Defs.' PI Opp., Ex. D ("Leonard Dep.") 17.

[89] *Id.* at 19.

[90] Mathews Defs.' SJ Br., Ex. 21.

on inquiry notice by July 2010 at the latest and that the statute of limitations began running at that time. Because Plaintiffs filed suit in March 2013, their claims relating to the ITRAX Transfers are untimely even under New York's statute of limitations. Thus, for this second, independent reason, partial summary judgment in favor of Defendants is appropriate as to those transfers.

## IV. CONCLUSION

For the reason stated in this Memorandum Opinion, I grant Defendants' motion for partial summary judgment that Plaintiffs' claims based on the ITRAX Transfers were brought after the expiration of the applicable statute of limitations and are barred by laches. Accordingly, those claims are dismissed with prejudice. This ruling is without prejudice to any claims Plaintiffs may have based on other transfers.

**IT IS SO ORDERED.**